ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X

EDMIN ALICEA,

                Plaintiff,

        -against-

THE CITY OF NEW YORK,
POLICE OFFICER ALEJANDRO RIVAS (TAX 925987),
DETECTIVE RICHARD BABOOLAL (TAX 924906), and
POLICE SERGEANT FREDY CRUZ (TAX 915528),

                Defendants.

Case Number: 13 CV 7073 (JGK) (GWG)
-------------------------------------------X

                26 Court Street
                Brooklyn, New York

                August 20, 2014
                10:21 a.m.

      EXAMINATION BEFORE TRIAL of Defendant

SERGEANT FREDY CRUZ, taken by the Plaintiff, held at

the above time and place, before Joseph Adler, a

Stenotype Reporter and Notary Public of the State of

New York, pursuant to Notice and stipulations

between counsel.

1

2  A P P E A R A N C E S:

3

4  REIBMAN & WEINER, ESQS.
              Attorneys for the Plaintiff
5                 26 Court Street, Suite 1808
                  Brooklyn, New York 11242
6  BY: JESSICA MASSIMI, ESQ.

7

8

9  NEW YORK CITY LAW DEPARTMENT
   OFFICE OF THE CORPORATION COUNSEL
10             Attorneys for the Defendants
                  100 Church Street
11                New York, New York  10007
   BY: BRIAN J. FARRAR, ESQ.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          STIPULATIONS

3            IT IS HEREBY STIPULATED AND AGREED, by and

4     between the attorneys for the respective parties

5     herein, that the sealing and filing of the within

6     deposition be waived.

7

8            IT IS FURTHER STIPULATED AND AGREED that

9     such deposition may be signed and sworn to before

10    any officer authorized to administer an oath, with

11    the same force and effect as if signed and sworn

12    before the officer before whom said deposition is

13    taken.

14

15           IT IS FURTHER STIPULATED AND AGREED that

16    all objections, except as to the form are reserved

17    to the time of the trial.

18

19

20

21

22

23

24

25

1

2 S E R G E A N T   F R E D Y   C R U Z, called as a

3 witness, having first been duly sworn by the Notary

4 Public (Joseph Adler), was examined and testified as

5 follows:

6 EXAMINATION BY

7 MS. MASSIMI:

8     Q    Good morning, Sergeant.

9     A    Good morning.

10     Q    Could you do me a favor and just state

11 your name for the record?

12     A    Name is Sergeant Cruz, C-R-U-Z, Fredy

13 first name, F-R-E-D-Y.

14     Q.    What is your work address?

15     A.    1 Police Plaza, New York, New York 10038.

16     Q    My name is Jessica Massimi.  I am an

17 attorney, and I represent Edmin Alicea, the

18 plaintiff in this case.  I am going to be asking you

19 some questions today about an incident that began on

20 March 27 of 2012.  Do you understand that you have

21 taken an oath to tell the truth here today?

22     A    Yes.

23     Q    Do you understand that that is the same

24 oath that you take when you go to court?

25     A    Yes.

1                    CRUZ

2          MR. FARRAR: Objection.

3     A    No.

4     Q    Are you currently being sued in any other

5    lawsuits for civil rights violations?

6          MR. FARRAR: Objection.

7     A    No.

8     Q    As a member of the NYPD, are you trained

9    with regard to making observations?

10         MR. FARRAR: Objection.

11    A    Yes.

12    Q    Would you agree that it is important to

13   make observations?

14         MR. FARRAR: Objection.

15    A    Yes.

16    Q    Would you say, agree that it is important

17   to record your observations?

18         MR. FARRAR: Objection.

19    A    Yes.

20    Q    Would you agree that it is important to

21   record your observations truthfully?

22         MR. FARRAR: Objection.

23    A    Yes.

24    Q    Would you agree that it is important to

25   record your observations completely?

1                         CRUZ

2              MR. FARRAR:  Objection.

3        A     Yes.

4        Q     Do you agree that it is important to

5  record your observations truthfully and completely

6  because the record of what you observed will be used

7  in a legal proceeding?

8              MR. FARRAR:  Objection.

9        A     Yes.

10       Q     Do you agree that it is important to tell

11 the truth?

12       A     Yes.

13       Q     Would you agree that you have a duty to

14 make and record observations while you are on duty

15 in the discharge of your job responsibilities?

16             MR. FARRAR:  Objection.

17       A     Yes.

18       Q     Why is it important to tell the truth?

19             MR. FARRAR:  Objection.

20       A     If someone committed -- if someone

21 committed a crime and you saw it, yeah, it's very

22 important to -- to say the truth.

23       Q     Why is that?

24             MR. FARRAR:  Objection.

25       A     That's the oath that you took in -- in

1                      CRUZ

2    this job.

3         Q    Have you ever heard the term probable

4    cause before?

5         A    Yes.

6         Q    What does that term mean?

7              MR. FARRAR:  Objection.

8         A    It means that there's a -- a high

9    probability that yes, whatever crime took place or

10   violation did take place, and it's the level of --

11   how can I say?  It's the level of -- it pretty much

12   tells you that in order to make the arrest, you need

13   that probable cause, and once you reach that, then

14   you're able to make that arrest.

15        Q    Can you define the term probable cause

16   without using the term probable cause?

17             MR. FARRAR:  Objection.

18        A    No.

19        Q    Have you now told me everything you know

20   about probable cause?

21             MR. FARRAR:  Objection.

22        A    Yes.

23        Q    What circumstances must be present in

24   order for a member of the NYPD to arrest someone

25   without a warrant?

1                         CRUZ

2              MR. FARRAR:  Objection.

3       A    Without a warrant?

4       Q    Yes.

5       A    They need to see the crime taking place,

6    if there is any evidence involving that crime.

7       Q    Is that everything?

8       A    A complaint.  You need a complaint also,

9    someone making a complaint, yeah.

10      Q    Is that everything?

11      A    Yeah.

12             MR. FARRAR:  Objection.

13      Q    Did you understand that Mr. Alicea had

14   committed a crime on March 27, 2012?

15      A    Yes.

16      Q    What information did you have that led you

17   to believe that?

18      A    What information?

19      Q    Yes.

20      A    He was observed purchasing narcotics.  He

21   was observed eating, swallowing a narcotic.

22      Q    How do you know that he was observed

23   purchasing narcotics?

24      A    From the officer who made the observation.

25      Q    Who was the officer that made that

1                          CRUZ

2     observation?

3          A     Officer Baboolal.

4          Q     What did Officer Baboolal tell you with

5     regard to those allegations?

6          A     That he was observed purchasing narcotics.

7          Q     What details did Officer Baboolal provide

8     to you with regard to those allegations?

9          A     That he saw the individual purchasing

10    marijuana.

11         Q     Did Officer Baboolal tell you how much

12    money was exchanged?

13         A     No.

14         Q     Did Officer Baboolal tell you if any money

15    was exchanged?

16         A     Yes.

17         Q     Did he tell you how much money was

18    exchanged?

19         A     No.

20         Q     Did you ask him how much money was

21    exchanged?

22         A     No.

23         Q     Why not?

24         A     I -- he -- you would have to ask him how

25    much money.

1                    CRUZ

2        Q    I am going to ask him that, but I am just

3    asking, the question is why didn't you ask him how

4    much money was exchanged?

5        A    He sees the money, money being exchanged

6    to the -- to the seller.  How much was it, I don't

7    know.  You would have to ask him.

8        Q    When did Officer Baboolal first contact

9    you about this alleged purchase and sale?

10       A    That same day.

11       Q    When though?  Was it while he was at the

12   scene of the arrest, or was it hours later, or

13   something else?

14       A    No.  It was on that day, that afternoon.

15       Q    Did he contact you by radio?

16       A    I communicated with him to make sure of

17   what he observed, and I'm not sure how it was, by

18   radio or by phone, but I did communicate with him.

19       Q    How did you communicate with him?

20            MR. FARRAR:  Objection.

21       A    I'm not sure.

22       Q    When did you first communicate with him

23   regarding this arrest or this incident?

24       A    As soon as the individual was brought to

25   the precinct.

1               CRUZ

2      Q    The first time you communicated with

3    Officer Baboolal about his observation was when

4    Mr. Alicea was already at the precinct?

5      A    Right.

6      Q    Did Officer Baboolal ever provide you with

7    a description of this alleged seller?

8           MR. FARRAR:  Objection.

9      A    I can't remember.

10     Q    If Officer Baboolal had provided you with

11   a description of this alleged seller, would you have

12   recorded the description somewhere?

13          MR. FARRAR:  Objection.

14     A    No.

15     Q    Why not?

16     A    Unless he's -- unless we know the seller,

17   because a lot of times we do know the seller, you

18   know -- you know, we'll -- we'll make a -- you know,

19   we'll keep a mental note on the seller because a lot

20   of times -- a lot of them we don't know.  And just

21   for future reference, we may make an arrest later on

22   if we know the individual.  Yeah, and that's it.

23     Q    When you say you keep a mental note of

24   that information, what do you mean?

25          MR. FARRAR:  Objection.

1                    CRUZ

2        A    Meaning if we do see him -- if we do see

3   him out in the street in that location, you know,

4   we'll see if we could make an observation point and

5   just see if he is selling or not.

6        Q    What do you mean by observation point?

7        A    We'll set up to see if he's selling.

8   We'll have someone at a -- at a location observing

9   the individual to see if he is selling narcotics.

10       Q    If you do not write down the seller's

11  description anywhere and you do not arrest him, when

12  you observe the sale taking place, what steps need

13  to be taken in order to ensure that you are

14  arresting the correct person at a later date?

15            MR. FARRAR:  Objection.

16       A    I don't know.  You would have to ask the

17  observing officer if he's taking notes of the

18  individual selling.

19       Q    How much time can pass from when the sale

20  is observed to when it is no longer proper to arrest

21  the person for that sale?

22            MR. FARRAR:  Objection.

23       A    There is no time.

24       Q    You can arrest that person at any point in

25  the future?

1                        CRUZ

2            MR. FARRAR:  Objection.

3      A    If we -- if we identify the individual.

4      Q    You stated earlier that you were informed

5  that Edmin Alicea was observed swallowing narcotics?

6      A    Yes.  Through Officer Rivas.

7      Q    When did Officer Rivas first inform you

8  that he had observed that?

9      A    When he had spoken with me.

10     Q    When was that?

11     A    When I was at the precinct, he had called

12  me.

13     Q    How did he call you?

14     A    I don't remember.

15     Q    Was it on a cell phone?

16     A    I don't remember.

17     Q    Was it on a radio?

18          MR. FARRAR:  Objection.

19     A    Yeah, I don't -- he communicated with me.

20     Q    What did Officer Rivas tell you during

21  that communication?

22     A    That the individual swallowed one bag of

23  marijuana.

24     Q    Did Officer Rivas describe the bag to you?

25     A    He just said one bag of marijuana.

1                       CRUZ

2          Q    Did Officer Rivas tell you if Mr. Alicea

3     had resisted arrest?

4          A    I don't remember that.

5          Q    Did Officer Rivas tell you if Mr. Alicea

6     had struggled with them at all?

7          A    I am sorry?

8          Q    Did Officer Rivas tell you during that

9     initial conversation if Mr. Alicea struggled with

10    him at all?

11         A    No.  I don't remember.

12         Q    Other than Officers Baboolal and Officer

13    Rivas, did anyone else inform you that they believed

14    Mr. Alicea had engaged in any illegal activity?

15         A    No.

16         Q    Who was working with Officer Rivas on that

17    day when he arrested Mr. Alicea?

18              MR. FARRAR:  Objection.

19         A    I can't say.

20         Q    Would you agree that sometimes prisoners

21    are injured during the course of an arrest?

22              MR. FARRAR:  Objection.

23         A    Can you repeat the question again?

24         Q    Would you agree that sometimes prisoners

25    are injured during the course of an arrest?

1                           CRUZ

2          A    Yes.

3          Q    Has a prisoner ever been injured while you

4    have been arresting him or her?

5               MR. FARRAR:  Objection.

6          A    No.

7          Q    Would you agree that a member of service

8    who takes custody of an arrested person should

9    closely monitor him for any apparent injuries?

10              MR. FARRAR:  Objection.

11         A    Yes.

12         Q    Earlier you stated that as a supervising

13   sergeant, you would be one individual who would be

14   required to make a record of those types of

15   injuries?

16              MR. FARRAR:  Objection.

17         A    If they are visible injuries, yes.

18         Q    You would be one person that is required

19   to make a record of those injuries?

20              MR. FARRAR:  Objection.

21         A    To make a record?  No.  The officer.

22         Q    The arresting officer?

23         A    The arresting officer.

24         Q    Would anyone else be required to make a

25   record of those injuries?

1                    CRUZ

2      A    No.

3      Q    Are you required to protect arrestees from

4   physical injury after he or she has been taken into

5   custody?

6           MR. FARRAR:  Objection.

7      A    Yes.

8      Q    What are the procedures for doing that?

9           MR. FARRAR:  Objection.

10     A    To protect them?

11     Q    Yes.

12     A    Make sure that the individual who is now

13  in our custody, you know, is -- doesn't hurt

14  himself.  You know, if he did receive some sort of

15  injury, make sure that -- physical injury, make sure

16  that he gets the medical attention he's required

17  for.

18     Q    Do you have an obligation to ensure that

19  that happens as a supervising sergeant?

20          MR. FARRAR:  Objection.

21     A    For the person to receive medical

22  attention?

23     Q    If you observe that they are physically

24  injured.

25     A    Yes.

1                    CRUZ

2      Q    Are members of the NYPD required to make

3  medical assistance available to prisoners who are

4  injured?

5           MR. FARRAR:  Objection.

6      A    If -- if they're actually injured, yes.

7      Q    Are members of the NYPD required to make

8  medical assistance available to prisoners who claim

9  they are injured?

10          MR. FARRAR:  Objection.

11     A    Who claim they're injured?

12     Q    Yes.

13     A    Yes.

14     Q    Would you agree that the deliberate use of

15 excessive force is a violation of a person's

16 constitutional rights?

17          MR. FARRAR:  Objection.

18     A    Yes.

19     Q    Are you trained to avoid excessive force?

20          MR. FARRAR:  Objection.

21     A    Yes.

22     Q    Do you ever provide training to the

23 officers that you supervise regarding the use of

24 excessive force?

25     A    No, I don't train.

1                         CRUZ

2         Q    Do you ever provide any on-the-job

3    instruction for those officers regarding the use of

4    excessive force?

5              MR. FARRAR:   Objection.

6         A    No.

7         Q    Do your officers ever ask you for guidance

8    regarding the appropriate use of force?

9         A    No.  We receive memos from the department

10   advising us of -- of the use of physical force.

11        Q    What are those memos called?

12             MR. FARRAR:   Objection.

13        A    Department memos.

14        Q    How often do you receive those memos?

15             MR. FARRAR:   Objection.

16        A    Every so often.

17        Q    Like monthly?

18        A    I can't say.

19        Q    When did you most recently receive a memo

20   regarding the use of excessive force?

21             MR. FARRAR:   Objection.

22        A    I can't say, but every once in a while, we

23   get them.

24        Q    What do you do with those memos once you

25   receive them?

1                    CRUZ

2          MR. FARRAR:  Objection.

3     A    We read them.

4     Q    Then you throw them away?

5          MR. FARRAR:  Objection.

6     A    No.  They're -- they're kept in the

7    database also.

8     Q    They are kept digitally you mean?

9     A    Yeah, digitally.

10     Q    Do you receive a hard copy?

11          MR. FARRAR:  Objection.

12     A    Yes.

13     Q    If you need to retrieve a copy of it from

14    the database, are you able to do that?

15          MR. FARRAR:  Objection.

16     A    Yes.

17     Q    Are these sections of the patrol guide, or

18    is it something else?

19          MR. FARRAR:  Objection.

20     A    Just memos that are received.

21     Q    It is not necessarily updates to the

22    patrol guide, it is something else?

23     A    Right.

24     Q    Who is responsible for maintaining those

25    memos in the database?

1                         CRUZ

2              MR. FARRAR:  Objection.

3        A    I don't know.

4        Q    Do officers that you are supervising ever

5    ask you to explain or clarify these memos?

6              MR. FARRAR:  Objection.

7        A    No.

8        Q    If an officer had a question about the use

9    of excessive force or the propriety of a particular

10   action, who would they go to for guidance?

11             MR. FARRAR:  Objection.

12       A    A lot of times when we have legal

13   questions, we'll call the legal department.

14       Q    Who would you contact at the legal

15   department?

16             MR. FARRAR:  Objection.

17       A    I don't have the name.

18       Q    If it is not a legal question and it is

19   just a question about the propriety of whether or

20   not to get a prisoner medical assistance for

21   instance, who would that officer go to for guidance?

22             MR. FARRAR:  Objection.

23       A    For medical assistance?

24       Q    As an example, if an officer had a

25   question about how to proceed with a particular

1                          CRUZ

2    activity or action, who would they go to for

3    guidance?

4              MR. FARRAR:  Objection.

5        A    They would go to their supervisor.

6        Q    Who is their supervisor?

7              MR. FARRAR:  Objection.

8        A    Who are we talking here?

9        Q    Let us say Officer Rivas for instance.

10   Who supervised Officer Rivas on March 27, 2012?

11       A    Myself.

12       Q    Why were you his supervisor?

13             MR. FARRAR:  Objection.

14       A    Because I was at work, and he's -- I'm his

15   supervisor.

16       Q    What is the chain of command on a given

17   day at the 33rd Precinct in terms of ranks?

18             MR. FARRAR:  Objection.

19       A    What do you mean by that?

20       Q    Just list the ranks in order from greatest

21   amount of authority to least amount of authority.

22       A    Police officer, sergeant, lieutenant,

23   captain.

24       Q    On a given day, if somebody holding the

25   rank of police officer had a question about how to

1                          CRUZ

2     proceed with a particular activity, would they go to

3     the captain?

4          A     No.

5          Q     Would they go to the lieutenant?

6          A     No.

7          Q     Would they ask the sergeant?

8          A     They would ask -- if they had a question,

9     the sergeant.

10         Q     How much force are you allowed to use in

11    effectuating the arrest of an individual?

12               MR. FARRAR:  Objection.

13         A     The minimum amount.

14         Q     Are there types of force that you are not

15    allowed to use?

16               MR. FARRAR:  Objection.

17         A     Chokehold.  That's a -- that's a no-no.

18         Q     Would you agree that only the amount of

19    force necessary to overcome resistance would be used

20    to effect an arrest?

21               MR. FARRAR:  Objection.

22         A     The minimum amount.

23         Q     Do you have an obligation to stop the use

24    of excessive force if you observe such activity?

25         A     Yes.

1                    CRUZ

2      Q    Does the patrol guide say anything about

3  the use of handcuffs?

4           MR. FARRAR:  Objection.

5      A    In what context?

6      Q    In any context.

7      A    When placing an individual under arrest,

8  yes, you have to place handcuffs on the individual.

9      Q    Is there any written material that you

10 know of that explains how handcuffs are supposed to

11 be applied?

12          MR. FARRAR:  Objection.

13     A    No.

14     Q    Are properly applied handcuffs supposed to

15 cause injury?

16          MR. FARRAR:  Objection.

17     A    Properly applied?  No.

18     Q    What is the proper way to apply handcuffs?

19     A    The proper way is to place the hands

20 behind the individual as if he was praying, both

21 hands like this (indicating), palms facing each

22 other, and you then place the handcuffs.  You also

23 want to lock the handcuffs and give them, you know,

24 space (indicating).  That's pretty much it.

25     Q    When you say place the individual's hands

1                          CRUZ

2    behind him as if he is praying, do you mean so his

3    hands are pointing up or down?

4        A    No.  Pointing down.  Palms facing each

5    other behind his back.

6        Q    Is the application of handcuffs considered

7    the use of force?

8              MR. FARRAR:  Objection.

9        A    No.

10       Q    Are officers trained to respond or take

11   action if a person complains that the handcuffs are

12   causing pain?

13             MR. FARRAR:  Objection.

14       A    Repeat the question again.

15       Q    Sure.

16             MS. MASSIMI:  Can you read it back?

17             (Requested testimony was read.)

18             MR. FARRAR:  Objection.

19       A    Every situation is different so -- but at

20   the appropriate time, reasonable time and -- yes.

21       Q    What action is a member of the NYPD

22   supposed to take if a prisoner complains of

23   handcuffs being too tight?

24             MR. FARRAR:  Objection.

25       A    I'm sorry.  Say it again.

1                      CRUZ

2          MS. MASSIMI:  Could you read that back?

3          (Requested testimony was read.)

4      A    When?

5      Q    No.

6          MS. MASSIMI:  Could you just read that

7      back one more time?

8      A    It varies.  You could have a disorderly

9  group, a large group, and you need to remove the

10  individual.  You know, there may not be time enough

11  to make that adjustment.  Once he's placed in the

12  car and the seat belt put on, you may -- may loosen

13  up the handcuffs at that point to make him feel

14  comfortable, or back at the precinct once it's

15  controlled in a controlled environment, you're able

16  then to loosen up the handcuffs a little bit.

17      Q    Have you ever observed handcuffs applied

18  too tightly?

19          MR. FARRAR:  Objection.

20      A    No.

21      Q    Do handcuffs contain a mechanism that you

22  are supposed to activate to ensure that they do not

23  tighten further after application?

24      A    Yes.

25      Q    What is that mechanism called?

1                    CRUZ

2        A    It's like a -- a lock.  It's just a simple

3   hole, and you put the key in and lock it in.

4        Q    Are the handcuffs that members of the NYPD

5   carry required to contain that mechanism?

6        A    Yeah.  All the handcuffs have that.

7        Q    You mentioned the term chokehold before,

8   so you are familiar with the term chokehold?

9             MR. FARRAR:  Objection.

10       A    Yes.

11       Q    What is a chokehold?

12            MR. FARRAR:  Objection.

13       A    It's where you place your hands or your

14   forearm on the individual's neck obstructing his

15   breathing.

16       Q    Is that a complete description of a

17   chokehold?

18            MR. FARRAR:  Objection.

19       A    To my knowledge, yes.

20       Q    Are you aware of any official definition

21   of chokehold in any NYPD documents?

22            MR. FARRAR:  Objection.

23       A    No.

24       Q    Are there circumstances under which a

25   chokehold is permitted?

1                          CRUZ

2           MR. FARRAR:  Objection.

3      A    No.

4      Q    Have you ever used a chokehold?

5      A    No.

6      Q    Do you have a duty to preserve evidence of

7    a crime?

8      A    Yes.

9      Q    Do you have a duty to preserve drugs which

10   you believe are in the possession of an arrestee?

11     A    Yes.

12     Q    On March 27, 2012, did you believe that

13   Mr. Alicea was in possession of drugs when he was

14   arrested?

15          MR. FARRAR:  Objection.

16     A    You would have to ask the officer that

17   observed.

18     Q    Did you observe any other officer attempt

19   to take steps to recover these items from

20   Mr. Alicea?

21          MR. FARRAR:  Objection.

22     A    No.

23     Q    What is the Conditions Unit?

24     A    The Conditions Unit, it's a unit that we

25   address pretty much all quality of life issues.  It

1                          CRUZ

2    could vary from noise complaints to narcotic sales.

3         Q    What are some other quality of life issues

4    that the Conditions Unit addresses?

5              MR. FARRAR:  Objection.

6         A    Like I said, it varies.  It varies.

7         Q    When you say that the Conditions Unit is

8    supposed to address all quality of life issues, what

9    does that entail?

10             MR. FARRAR:  Objection.

11        A    Any jobs that are generated through 911,

12   311, jobs that we get, complaints that we receive

13   during community board meetings.

14        Q    Does the Conditions Unit ever address

15   situations that are not brought to your attention by

16   911, 311, or community board meetings?

17        A    Say that again.  I'm sorry.

18        Q    Does the Conditions Unit ever address all

19   quality of life issues that are not brought to your

20   precinct's attention by 911, 311, or community board

21   meetings?

22             MR. FARRAR:  Objection.

23        A    All?

24             MS. MASSIMI:  Can you just read that back?

25             (Requested testimony was read.)

1                           CRUZ

2          A     We also address things that we see out on

3     the street, so like peddler units, people selling

4     items out on the street without the proper licenses.

5          Q     When you say that the Conditions Unit

6     addresses those situations, what do you mean by

7     address?

8                MR. FARRAR:  Objection.

9          A     We see if they are properly licensed.  If

10    not, summonses are issued.

11         Q     Are you a member of the Conditions Unit?

12         A     Yes.

13         Q     Do you supervise officers who are assigned

14    to the Conditions Unit?

15         A     Yes.

16         Q     What are the duties and functions of

17    members of the Conditions Unit?

18                MR. FARRAR:  Objection.  Asked and

19           answered.

20         Q     Have you told me everything about the

21    duties and functions of members of the Conditions

22    Unit?

23                MR. FARRAR:  Objection.

24         A     Yes.

25         Q     Do members of the Conditions Unit receive

1                          CRUZ

2    training to join that unit?

3         A    No.

4         Q    How does someone become a member of the

5    Conditions Unit?

6         A    They apply for the position, and they're

7    then picked when the proper time comes.  They are

8    selected.

9         Q    Did you apply to become a member of the

10   Conditions Unit?

11        A    No.

12        Q    Were you selected to become a member of

13   the Conditions Unit?

14        A    Yeah.  Yes.

15        Q    Do you know why you were assigned to that

16   unit?

17        A    No.

18        Q    Were you a supervisor of the Conditions

19   Unit on March 27, 2012?

20        A    Yes.

21        Q    How does the Conditions Unit operate?

22             MR. FARRAR:  Objection.

23        A    What do you mean operate?

24        Q    Just explain to me how it functions.

25             MR. FARRAR:  Objection.

1                          CRUZ

2        A     As I mentioned before, we -- we address,

3    you know, certain quality of life issues.

4    Complaints.

5        Q     How does the Conditions Unit locate crime?

6              MR. FARRAR:   Objection.

7        A     We get these complaints, as I said before,

8    911, 311, community board meetings that we attend

9    to, we receive complaints from community board

10   members.

11       Q     Are there other ways that the Conditions

12   Unit locates crime?

13             MR. FARRAR:   Objection.

14       A     As they're observing -- you know, when

15   they're driving in the street, yes.

16       Q     Is there an observation detail of the

17   Conditions Unit?

18       A     No.

19       Q     Are there members of the Conditions Unit

20   who are assigned solely to make observations?

21       A     I'm sorry.   Say that again.

22       Q     Are there members of the Conditions Unit

23   who are assigned solely to make observations?

24       A     No.

25       Q     Is there any reason why a member of the

1                         CRUZ

2   Conditions Unit would observe a crime but not make

3   the arrest themselves?

4            MR. FARRAR:  Objection.

5       A    I can't say.  I can't answer that.

6       Q    Are certain members of the Conditions Unit

7   undercover?

8       A    No.

9       Q    Is every member of the NYPD in your

10  precinct assigned to a particular unit?

11           MR. FARRAR:  Objection.

12      A    I'm sorry?

13      Q    Is every member of the NYPD in the 33rd

14  Precinct assigned to a particular unit?

15           MR. FARRAR:  Objection.

16      A    No.

17      Q    What are some of the other units that you

18  are aware of in your precinct, other than the

19  Conditions Unit?

20      A    We have patrol.  We also have -- it's a

21  large, you know, precinct.  We have Domestic

22  Violence Unit.  What else do we have?  We have

23  anti-crime.

24      Q    Are members of the Anti-crime Unit

25  undercover?

1                    CRUZ

2          MR. FARRAR:  Objection.

3     A    They operate plainclothes.

4     Q    Do any members of the Conditions Unit

5  operate in plainclothes?

6          MR. FARRAR:  Objection.

7     A    It varies.

8     Q    On March 27, 2012, were there members of

9  the Conditions Unit operating in plainclothes?

10    A    No.

11    Q    For what purpose would a member of the

12 Conditions Unit be operating in plainclothes?

13         MR. FARRAR:  Objection.

14    A    Again, it varies.

15    Q    Do you know if Officer Baboolal was in

16 plainclothes on March 27, 2012?

17    A    You would have to ask him.

18    Q    Do you have any independent recollection

19 of whether or not he was?

20    A    No.

21    Q    You have listed three additional units,

22 other than the Conditions Unit.  You have listed the

23 Patrol Unit, Domestic Violence Unit, and Anti-crime

24 Unit.  Are those all the units that you can

25 currently recollect?

1                          CRUZ

2              MR. FARRAR:  Objection.

3         A    Yeah.  Yes.

4         Q    Do those units ever work together?

5              MR. FARRAR:  Objection.

6         A    No.

7         Q    How do members of the Conditions Unit get

8    assigned to go out on patrol?

9         A    Patrol?

10        Q    Do members of the Conditions Unit ever

11   patrol your precinct, patrol the 33rd Precinct?

12        A    Yes.

13        Q    How do they get assigned to do that?

14        A    If the patrol -- if the patrol unit is

15   shorthanded, then members of the Conditions Unit are

16   then, you know, chosen to -- to -- to, you know,

17   perform patrol duties.

18        Q    Do members of the Conditions Unit ever

19   perform patrols as part of their duties with the

20   Conditions Unit?

21        A    Yeah, yes.

22        Q    When on patrol, is there an individual who

23   is the designated recorder for a particular vehicle?

24        A    The recorder?  Yeah -- yes.

25        Q    Where does the recorder usually sit in the

1                        CRUZ

2    vehicle?

3        A    Passenger.

4        Q    What are the duties and functions of the

5    recorder?

6        A    Record all activities, radio runs, arrest

7    situations, car stops.

8        Q    Where does the recorder record this

9    information?

10       A    In his memo book.

11       Q    Is he required to record this information

12   anywhere else?

13           MR. FARRAR:  Objection.

14       A    No, that's -- no.

15       Q    Is he assigned at the beginning of his

16   shift to be the recorder?

17       A    That's -- that's -- that's decided among

18   both individuals that are doing patrol.

19       Q    Are they required to inform anyone

20   regarding who is going to be the recorder and who is

21   going to operate the vehicle?

22       A    No.

23       Q    Are they required to make a notation in

24   their memo book about whether or not they were the

25   recorder?

1                          CRUZ

2        A    Yes.

3        Q    What would the notation say?

4             MR. FARRAR:  Objection.

5        A    The notation would say operator or

6    recorder.

7        Q    By operator, do you mean the designated

8    driver?

9        A    Right, yes.

10       Q    Okay.

11       A    But that varies throughout the day.

12       Q    What do you mean?

13       A    It, you know -- you may have situations

14   where the officer then -- one of the officers made

15   an arrest, so that car would be taken out of service

16   or there may be a switch of personnel, so it's not

17   constantly constant.  It changes throughout the day.

18       Q    Is there a reason why an individual and

19   his partner might be assigned to patrol an area with

20   a third individual in their vehicle?

21       A    No.

22       Q    Does that ever happen?

23       A    Yeah.

24       Q    What is the maximum number of officers

25   that can patrol in one car?  I am not talking about

1                    CRUZ

2  a van; I am just talking about a regular patrol

3  vehicle.  What is the maximum number of officers

4  that can patrol in that vehicle at one time?

5      A    It varies.  It varies.

6      Q    More than three?

7      A    It could be three; it could be four.

8      Q    Is there a reason why there would be three

9  people patrolling in one vehicle?

10     A    There would probably be no cars available.

11     Q    Is there a reason why there would be four

12 people patrolling in one vehicle?

13          MR. FARRAR:  Objection.

14     A    No.

15     Q    Are there members of the Conditions Unit

16 that drive unmarked police cars ever?

17     A    Occasionally we drive -- we operate

18 unmarked vehicles.

19     Q    What is the purpose of operating an

20 unmarked vehicle?

21     A    Again, we may not have the cars available,

22 marked cars available.

23     Q    Are there members of the Conditions Unit

24 who on occasion will wear a uniform but also drive

25 an unmarked vehicle?

```
1                      CRUZ

2        A    Uniform in an unmarked?

3        Q    Yes.

4        A    Yes.

5        Q    What is the purpose of that?

6             MR. FARRAR:  Objection.

7        A    Again, we may not have available cars.

8        Q    Is there ever an occasion where a member

9   of the Conditions Unit will wear plainclothes but

10  drive a marked vehicle?

11       A    I'm sorry.  Say that again.

12            MS. MASSIMI:  Can you just read that back?

13            (Requested testimony was read.)

14       A    No.

15       Q    Does every command have a Conditions Unit?

16            MR. FARRAR:  Objection.

17       A    I can't say.

18       Q    What are the expectations of members of

19  the Conditions Unit?

20            MR. FARRAR:  Objection.

21       A    The objection?

22       Q    The expectations of somebody who is

23  assigned to the Conditions Unit, what are they

24  expected to do?

25       A    Once again, addressing quality of life
```

1                          CRUZ

2    issues.

3         Q    Can you work as a member of more than one

4    unit at a time?

5         A    I don't understand.

6         Q    If you are assigned to the Conditions

7    Unit, can you also on occasion work with other

8    units?

9         A    Yeah.

10        Q    How many arrests per year are members of

11   the Conditions Unit required to make?

12             MR. FARRAR:  Objection.

13        A    There's no requirement.

14        Q    Did you ever ask Officer Baboolal why he

15   did not arrest Edmin Alicea after observing what he

16   told you was a hand-to-hand transaction?

17        A    Can you say that again?

18        Q    Did you ever ask Officer Baboolal why he

19   did not personally arrest Edmin Alicea after

20   observing what he claimed was a hand-to-hand drug

21   transaction?

22        A    You would have to ask him.

23        Q    I am asking you if you could think of any

24   reason why he would have observed what he said was

25   criminal activity but not made the arrest himself?

1                    CRUZ

2    I am just generally asking if there is ever a

3    situation where an officer who is in plainclothes

4    might observe what he claims was criminal activity

5    but then ask another officer to do the arrest?

6              MR. FARRAR:  Objection.

7    A    No.  You would have to ask him.

8    Q    I am asking you if you ever heard of a

9    scenario like that?

10             MR. FARRAR:  Objection.

11   A    No, I'm -- no.

12   Q    Does the Conditions Unit ever perform

13   operations with one officer serving as the

14   observation point?

15   A    Yes.

16   Q    Can you explain to me how that observation

17   point is supposed to function?

18             MR. FARRAR:  Objection.

19   A    The observation point, his job -- his only

20   job was to observe the activity that occurred, and

21   from his observation, if there was a crime

22   committed, he would transmit that -- that activity

23   to -- to the -- to the catch car or chase car.

24   Q    Is that person referred to as the

25   observation point?

1                         CRUZ

2        A    Right.

3        Q    And the catch car is the officer who makes

4    the apprehension?

5        A    Yes.

6        Q    When the observation point observes what

7    he claims is criminal activity and then transmits

8    that information to the catch car, how does he

9    transmit that information?

10            MR. FARRAR:  Objection.

11       A    You would have to ask the observing

12   officer.

13       Q    Well, I am asking in general, how would an

14   observation point communicate with another vehicle?

15       A    Generally, point to point.

16       Q    Is that communication recorded?

17       A    No.

18       Q    Do you know why it's not recorded?

19       A    No.

20       Q    The point to point, is that communication

21   that is done on regularly issued radios?

22       A    Yes.

23       Q    The officers are not required to sign out

24   those radios before taking them?

25       A    Each officer has a radio assigned to them.

1                         CRUZ

2        Q    That is what they would use for the point

3   to point?

4        A    Yes.

5        Q    The observation point, are they always in

6   plainclothes?

7             MR. FARRAR:  Objection.

8        A    I can't say.  Most of the time they would

9   be in uniform.

10       Q    If the observation point is in

11  plainclothes, is the idea that they are trying to go

12  undetected as an officer?

13       A    Well, that would be the idea, yes.

14       Q    They would be undercover?

15            MR. FARRAR:  Objection.

16       A    Plainclothes.

17       Q    Just going back to March 27, 2012, were

18  you on duty that day?

19       A    Yes.

20       Q    What shift were you working?

21       A    I started at 8:00 in the morning.

22       Q    When was your shift expected to end?

23       A    4:57 in the afternoon.

24       Q    Why 4:57?

25       A    That totals up eight hours and 57 minutes.

1                    CRUZ

2      Q    I am just curious, it was scheduled to end

3   at 4:57?

4      A    My tour?

5      Q    Yes.

6      A    Yes.

7      Q    Not 5:00 p.m.?

8      A    No.   Sergeants are -- their tours are

9   eight hours and 57 minutes.

10      Q    Is there a reason?

11      A    (No verbal response given.)

12      Q    What did you understand your

13   responsibilities to be during that tour on March 27,

14   2012?

15           MR. FARRAR:   Objection.

16      A    Can you repeat the question again?

17           MS. MASSIMI:   Can you just read that back?

18           (Requested testimony was read.)

19      A    Supervise my Conditions Unit.

20      Q    Did you have any specific duties during

21   that shift?

22           MR. FARRAR:   Objection.

23           MS. MASSIMI:   I can rephrase it.

24      Q    When you say that your responsibilities

25   were to supervise your Conditions Unit, just

1                          CRUZ

2    elaborate on that for me. Specifically, what were

3    your duties during that day?

4              MR. FARRAR:  Objection.

5         Q    On March 27, 2012?

6         A    That day I -- I had a court case.  I went

7    down to court.  Once I was finished with my court

8    case, I came back to the precinct.  Once I came back

9    to the precinct, we -- I looked at some of the

10   places we had been receiving complaints about

11   regarding narcotics activity, and at that point, I

12   gathered up my Conditions Unit and instructed them

13   that we were going to look into that location.

14        Q    Just tell me everything that you did that

15   day.  Go on.

16             MR. FARRAR:  Objection.

17        Q    On your shift on March 27, 2012.

18        A    What I just said.  I went to court.

19        Q    Yes?

20        A    After court, I came back to the precinct.

21        Q    Yes?

22        A    Once I was back at the precinct, we

23   decided to -- to address the narcotic conditions at

24   that location.

25        Q    At what location?

1                         CRUZ

2      A    What was that?  172 between Audubon and

3   Saint Nicholas.

4      Q    Then what else did you do for the rest of

5   your shift that day?  Just tell me everything in

6   chronological order that you did that day.

7           MR. FARRAR:  Objection.

8      A    That was it.  The officers were -- went

9   out on the field, and I stayed at the precinct.

10     Q    What did you do when you stayed at the

11  precinct?

12     A    I can't say.  I don't remember.

13     Q    Do you remember anything that you did

14  after you sent the officers out?

15     A    No, I can't say.  It's --

16     Q    What time did you send the officers out?

17     A    I don't remember.

18     Q    From that point on, you do not recall

19  anything else you did?

20          MR. FARRAR:  Objection.

21     A    No.

22     Q    When you said you gathered up the

23  Conditions Unit, who did you gather up, to use your

24  words?

25     A    Officer Baboolal, Officer Rivas, Officer

1                        CRUZ

2    McGrawth, Officer Arrico.  That I remember, yeah,

3    that's -- that's it.

4        Q    Who was Officer McGrawth's partner on

5    March 27, 2012?

6             MR. FARRAR:  Objection.

7        A    I don't remember.

8        Q    Who was Officer Baboolal's partner on

9    March 27, 2012?

10            MR. FARRAR:  Objection.

11       A    I don't remember.

12       Q    Who was Rivas's partner on that day?

13            MR. FARRAR:  Objection.

14       A    I don't remember.

15       Q    Who was Arrico's partner on that day?

16            MR. FARRAR:  Objection.

17       A    I don't remember.

18       Q    Who were the other members of the

19   Conditions Unit on that day?

20       A    Just the ones that I mentioned to you.

21       Q    Those were the only four that were on duty

22   that day during your shift?

23       A    Yeah, that I remember.

24       Q    What did you tell them after you gathered

25   them up?

1                    CRUZ

2          MR. FARRAR:  Objection.

3     A     That we were addressing the narcotic

4  conditions at 172 between Audubon and Saint

5  Nicholas.

6     Q     How did you decide to address conditions

7  in that area that day?

8     A     Once again, as I mentioned before,

9  complaints that I received from the community, 911

10  jobs, 311 jobs.

11     Q     What do you mean?  Do you mean just

12  citizens calling in to 911 and 311 giving

13  complaints?

14     A     Right, right.

15     Q     Who gives those complaints to you?

16     A     Those -- those are generated through the

17  computer, and we get them.  I also get phone calls.

18  Attending the meetings.  There's a church nearby.

19     Q     How many complaints do you have to receive

20  before you decide to send the Conditions Unit to a

21  particular area?

22          MR. FARRAR:  Objection.

23     A     No.  There's no given amount of

24  complaints.

25     Q     What circumstances have to exist in order

1                          CRUZ

2      for you to make a determination that a particular

3      area is a drug-prone area?

4                  MR. FARRAR:  Objection.

5         A    No.  There is no criteria.

6         Q    How do you decide that a particular area

7      is a drug-prone area?

8         A    Well, if you receive the job after a

9      couple of 911 jobs indicating the same location or

10     maybe 311, people using the 311 system, you'll see

11     how many complaints that area has received, how many

12     phone calls.

13        Q    You are saying that before you decided to

14     send a Conditions Unit to this area, 172nd Street

15     between Audubon and Saint Nicholas, you received 311

16     complaints, 911 complaints, and what other types of

17     complaints did you receive?

18        A    Phone calls from the community.

19        Q    In any of those 911 complaints, were there

20     any descriptions provided of any purported criminals

21     or perpetrators?

22                 MR. FARRAR:  Objection.

23        Q    That you recall?

24        A    No.

25        Q    What about in any of the 311 complaints

1                    CRUZ

2    that you received?  Any physical descriptions

3    provided?

4         A    No.

5         Q    Did you take any phone calls regarding

6    that area on 172nd Street between Audubon and Saint

7    Nicholas that provided you with any physical

8    descriptions of any purported perpetrators?

9         A    I've got phone calls but no description.

10   Just location.

11        Q    When you sent the Conditions Unit out that

12   day, you were not looking for anyone in particular?

13        A    No.

14        Q    When you advised Baboolal, Rivas,

15   McGrawth, and Arrico on that day, who did you assign

16   to be the observation point?

17        A    Officer Baboolal.

18        Q    Had Officer Baboolal arrived for duty that

19   day in uniform or in plainclothes?

20             MR. FARRAR:  Objection.

21        A    If he arrived?

22        Q    Did he show up for work that day wearing

23   his uniform or plainclothes?

24        A    No, I can't -- I can't say if he was in

25   uniform.

1                      CRUZ

2      Q    Why did you select Officer Baboolal to be

3  the observation point?

4      A    No particular reason.  No particular

5  reason.

6      Q    Did he maybe say I will be the observation

7  point?

8      A    No.  No particular reason.  Everybody

9  has -- everybody takes a turn whenever we do some

10 sort of operation like that.

11     Q    Did you assign Rivas, McGrawth, and Arrico

12 to be the catch car?

13     A    Yes.

14     Q    Did you assign anyone in particular to be

15 the driver?

16     A    No.

17     Q    Did you assign anyone in particular to be

18 the recorder?

19     A    No.

20     Q    Did they ever tell you who had decided to

21 be the recorder versus the driver?

22     A    No.

23          MS. MASSIMI:  Can you just give me one

24     second?

25       (A recess was taken from 1:21 to 1:25.)

1                          CRUZ

2            (Requested testimony was read.)

3      Q    Did you brief anyone else at the beginning

4    of your shift?

5      A    What do you mean brief?

6      Q    How would you describe the information

7    that you provided to the four members of the

8    Conditions Unit?

9      A    How would I provide it?

10     Q    How would you describe the information

11   that you gave to them?

12     A    Simply we would get together and describe

13   what we're about to do.  That's pretty much it.

14     Q    Had you ever ordered the Conditions Unit

15   to patrol the area of 172nd Street between Audubon

16   and Saint Nicholas previously, previous to March 27,

17   2012?

18     A    Whenever we're patrolling, we always --

19   always drive by.

20     Q    Can you describe that area for me?

21     A    Yeah.  It's a -- residential buildings, a

22   couple of businesses, a church nearby on the corner

23   of Audubon and 172.

24     Q    Does the recorder or the driver make

25   arrests?

1                    CRUZ

2          MR. FARRAR:  Objection.

3     A    They're both allowed to make arrests.

4     Q    Between the two of them, who would be

5  assigned as the arresting officer?

6          MR. FARRAR:  Objection.

7     A    That varies.  I can't say.

8     Q    Why is somebody designated as the

9  arresting officer?

10         MR. FARRAR:  Objection.

11    A    Again, it varies.

12    Q    Just explain to me how you determined

13 whether or not somebody is going to be the arresting

14 officer for a particular arrest?

15    A    Well, if the -- if the officer observed a

16 crime or if the officer observed, you know, the

17 destruction of evidence, the officer who apprehended

18 the individual, it varies.  The officer who observed

19 it.

20    Q    Did any of the officers from your command

21 call you from an arrest location during your shift

22 that day?

23    A    Yes.

24    Q    Who was that?

25    A    Officer Rivas.

```
 1                      CRUZ
 2       Q    Anyone else?
 3       A    Again, I spoke with Officer Baboolal.
 4       Q    Where was Officer Baboolal during that
 5   conversation?
 6       A    He was still at the -- at his observation
 7   post.
 8       Q    What did he tell you during that
 9   conversation?
10            MR. FARRAR:  Objection.
11       A    You have to ask him.
12       Q    I am just asking what you recall him
13   telling you.
14       A    He had described to me what he saw in
15   regards to the defendant, and as I mentioned before,
16   I asked him did you see him making a purchase?  He
17   said yes.
18       Q    Did he call you before you spoke to
19   Officer Rivas?
20       A    No.  He -- I called him.
21       Q    You spoke to Officer Rivas first?
22       A    No, no -- yeah, I spoke with Officer Rivas
23   first, and then I spoke with Officer Baboolal.
24       Q    Officer Rivas called you?
25       A    Yes.
```

```
 1                      CRUZ

 2       Q    On his radio?

 3       A    I can't -- I don't remember.

 4       Q    Do you remember how you called Officer

 5  Baboolal?

 6       A    No.  No, I don't know if it was department

 7  phone, my phone.  I don't remember.

 8       Q    How long after you spoke to Officer Rivas

 9  did you speak to Officer Baboolal?

10       A    A short time.  As soon as Officer Rivas

11  came with the defendant to the precinct.

12       Q    Officer Rivas was already back at the

13  precinct when you spoke to Officer Baboolal?

14       A    Yes.

15       Q    Did there come a point when Officer

16  Baboolal arrived back at the precinct that day?

17       A    Yeah.  Later on in the afternoon.

18       Q    At what time?

19       A    I don't remember.

20       Q    Why did he come back to the precinct?

21            MR. FARRAR:  Objection.

22       A    I can't say.  I mean, I don't know if he

23  was an arresting officer or if he had another arrest

24  himself or it was the end of tour.

25       Q    When you called Officer Baboolal that day
```

1                    CRUZ

2    at his observation point, did you reach him the

3    first time you attempted to reach him?

4        A    Yeah, yes.

5        Q    Was he surprised to hear from you?

6             MR. FARRAR:  Objection.

7        A    I can't say.  You would have to ask him.

8        Q    Did he seem surprised to hear from you?

9        A    I can't say.

10       Q    When did you first observe Edmin Alicea on

11   March 27, 2012?

12       A    When he was brought into the precinct.

13       Q    Can you describe his physical appearance,

14   please?

15            MR. FARRAR:  Objection.

16       A    Normal.

17       Q    What was he wearing?

18       A    I can't remember.

19       Q    Do you recall what color his shirt was?

20       A    No.

21       Q    Do you recall what kind of shirt he was

22   wearing?

23       A    No.

24       Q    Do you recall if he had anything on his

25   face?

1                      CRUZ

2       A    No.

3       Q    Do you recall if he had a dirty shirt?

4       A    No.

5       Q    Do you recall if he had any spots on his

6  shirt?

7       A    No.

8       Q    Had you ever heard about Edmin Alicea

9  before?

10      A    No.

11      Q    Had you ever seen Edmin Alicea before?

12      A    No.

13      Q    When you saw Edmin Alicea on that day, he

14  was a complete stranger to you?

15      A    Yes.

16      Q    Who was desk sergeant on that day when

17  Mr. Alicea was brought to the precinct?

18      A    I don't remember.

19      Q    If you wanted to find out who that was,

20  what documents would you reference?

21           MR. FARRAR:  Objection.

22      Q    How would you find out the name of the

23  desk sergeant on that day at that time?

24      A    From the roll call.

25      Q    What information is contained in the roll

1                         CRUZ

2    call?

3              MR. FARRAR:  Objection.

4         A    Just the assignment of all the personnel

5    in the precinct.

6         Q    Sorry.  Say that again.

7         A    Assignments of all personnel in the

8    precinct.

9         Q    It has their assignments for that day?

10        A    Yeah.  But that also varies because he may

11   never know.  If the desk officer was there for only

12   two, three hours, maybe he had to attend to other

13   matters.

14        Q    If he has to be relieved of his duty as

15   the desk officer, will there be a notation made in

16   the roll call regarding who takes over for him?

17             MR. FARRAR:  Objection.

18        A    No.

19        Q    Where is the roll call maintained?

20             MR. FARRAR:  Objection.

21        A    In the Roll Call Office.

22        Q    In the what?

23        A    Roll call.  It's called Roll Call Office.

24        Q    Is that at the precinct?

25        A    Yeah.

1                        CRUZ

2      Q    Is the roll call a document?

3      A    Yes.

4      Q    Is it maintained digitally or hard copy?

5           MR. FARRAR:   Objection.

6      A    A hard copy.

7      Q    Copies of it are kept in the Roll Call

8  Office?

9      A    In the record room.

10     Q    Who is responsible for maintaining the

11  roll calls that are kept in the record room?

12          MR. FARRAR:   Objection.

13     A    Roll call personnel.

14     Q    Are those members of service?

15     A    No.   Civilians.

16     Q    What time approximately was it when you

17  first observed Mr. Alicea on March 27, 2012?

18     A    I don't remember that.

19     Q    Where were you when you first observed

20  him?

21     A    Inside the precinct.

22     Q    Where inside the precinct?

23     A    By the desk.

24     Q    Which desk?

25     A    What can I say?   The -- we call it the

1                          CRUZ

2     desk where the -- the desk officer sits.

3          Q     The desk sergeant?

4          A     The desk sergeant, yeah.

5          Q     Were you standing there with the desk

6     sergeant?

7          A     I don't remember.  I was in the area.

8          Q     Which door did Mr. Alicea enter through?

9          A     I don't remember that.

10         Q     Does the desk face a particular door?

11         A     No.  The desk faces the lodging area, the

12    holding cells.

13         Q     How many entrances are there to the

14    building where you are --

15         A     Entrance to the building?

16         Q     How many entrances are there to that

17    building where you work?

18         A     There's a front entrance and a back

19    entrance.

20         Q     Those are the only two entrances?

21         A     Yeah.

22         Q     Did you actually see Mr. Alicea being

23    brought through one of those entrances?

24         A     No.  I just remember him being inside the

25    precinct.

1              CRUZ

2       Q    Where inside the precinct?

3       A    In front of the desk.

4       Q    That is your first recollection of him?

5       A    Yeah.

6       Q    Who was he standing with, if anyone?

7       A    Officer Rivas.

8       Q    Did you see anyone else standing with him?

9       A    No.  I don't remember, no.

10      Q    Did you observe Officer Rivas bring in any

11   other prisoners at that time?

12      A    No.  I don't remember.

13      Q    To your knowledge, had Officer Rivas made

14   any other arrests between arresting Mr. Alicea and

15   arriving at the precinct?

16      A    No.  I don't remember.

17      Q    While in custody, did you observe

18   Mr. Alicea do anything that you believed gave rise

19   to probable cause to detain him?

20      A    No.

21      Q    After you observed Mr. Alicea standing in

22   front of the desk sergeant's desk, what was the next

23   observation that you had of him?

24      A    Walking him to the holding cells.

25      Q    Who walked him to the holding cell?

1                           CRUZ

2        A     Officer Rivas.

3        Q     Between the time that you observed him

4   standing in front of the desk sergeant's desk up

5   until you observed Officer Rivas walking him to the

6   cell, was he under your constant observation?

7        A     Yes.

8        Q     How much time passed between those two

9   events?

10       A     A short amount of time.  I can't say, but

11   it was short.

12       Q     Did you have any conversations with

13   Mr. Alicea when he was standing at the desk

14   sergeant's desk?

15       A     No.  When I saw him, he was placed in the

16   cell.

17       Q     We will get to that, but when he was first

18   standing at the desk, did you have any conversations

19   with him?

20       A     No.

21       Q     Did he say anything to you?

22       A     No.

23       Q     Did you hear him say anything to anyone

24   else?

25       A     No.

```
 1                      CRUZ
 2      Q    Did Officer Rivas say anything to him?
 3      A    No.  I don't remember.
 4      Q    Did you observe whether he was in any
 5  physical distress?
 6      A    He was in no physical distress, none
 7  whatsoever.
 8      Q    How do you know that?
 9           MR. FARRAR:  Objection.
10      A    He was speaking.  He was breathing well.
11  Once you're in front of the desk, you have to give
12  your name, your pedigree information.  He was
13  speaking very clear.
14      Q    Did you perform a physical examination of
15  Mr. Alicea?
16      A    No.
17           MR. FARRAR:  Objection.
18      Q    Did you instruct anyone to perform a
19  physical examination of Mr. Alicea?
20           MR. FARRAR:  Objection.
21      A    No.
22      Q    Do you know if Mr. Alicea had fractured
23  any bones at that point?
24      A    No.
25      Q    Do you know if Mr. Alicea had any medical
```

1                         CRUZ

2    conditions at that time?

3         A    No.

4         Q    After you observed Officer Rivas walking

5    Mr. Alicea into the holding cell, what was the next

6    observation that you had of Mr. Alicea?

7         A    That he was normal.  There was nothing

8    unusual about him.

9         Q    When did you next lose or take your eyes

10   off of Mr. Alicea?

11              MR. FARRAR:  Objection.

12        A    After I spoke with him.

13        Q    When do you have a conversation with him

14   at first?

15        A    In the holding cell area.

16        Q    Was he already in the cell?

17        A    I -- I don't remember.  I remember asking

18   him, you know, if he -- why did you do it, eating

19   it?  And I also asked him are you okay?  Are you

20   having any problem breathing?  Do you want to go to

21   the hospital?  And he said no, I don't want to go to

22   the hospital.

23        Q    What was his response to each of those

24   other questions that you just told me about?

25              MR. FARRAR:  Objection.

1                       CRUZ

2       A    No.  He just answered no.  He was -- he

3   was normal, but you know, he wasn't saying much, but

4   when I asked him in detail why he ate it, he stood

5   quiet.

6       Q    When you asked him why he ate it, what

7   were you referring to?

8       A    The marijuana, the bag of marijuana.

9       Q    Did Officer Rivas describe the bag to you?

10      A    Yes.  He -- yes.

11      Q    What description did he provide?

12      A    Just one bag of marijuana.  One bag

13  containing marijuana.

14      Q    Did he describe the bag to you?

15      A    Just one small bag of marijuana.

16      Q    He did not tell you what type of bag it

17  was?

18           MR. FARRAR:  Objection.

19      A    No.

20      Q    After that conversation that you had with

21  Mr. Alicea, what did you do next?

22      A    I walked away.

23      Q    Did you fill out any forms memorializing

24  that conversation that you had just described to me?

25      A    No.

1                          CRUZ

2        Q    Do you know if Officer Rivas had the same

3    or similar type of conversation with Mr. Alicea?

4        A    I can't say.

5        Q    Do you know if he filled out any forms

6    with regard to that information that you just told

7    me about?

8        A    No.  I can't say.

9        Q    Did you instruct anyone to memorialize the

10   conversation that you just described to me?

11       A    No.

12       Q    Did anyone call for backup regarding the

13   arrest that was made of Mr. Alicea on 172nd Street?

14       A    I can't say that.

15       Q    Did anyone notify you that backup was

16   needed?

17       A    No.

18       Q    To your knowledge, how many members of the

19   NYPD were involved in the arrest and apprehension of

20   Mr. Alicea on March 27, 2012?

21            MR. FARRAR:  Objection.

22       A    Just Officer Rivas.

23       Q    No one else?

24       A    No.  I was at the precinct.  I saw Officer

25   Rivas with the -- with the defendant.

1

2    Q   We are just about done.  Have you now told

3  me everything that you remember about the arrest of

4  Mr. Alicea?

5        MR. FARRAR:  Objection.

6    Q   On March 27, 2012?

7    A   Yes.

8        MS. MASSIMI:  Okay.  Thank you.

9         (Whereupon, the proceedings were

10     concluded at 2:47 p.m.)

11

12                _____
                    Sergeant Fredy Cruz

13

Subscribed and sworn to before me

14

this _5_ day of _November_ 20_14_.

15

16  _____
    NOTARY PUBLIC

17                        LUIS A NIEVES
                Notary Public - State of New York

18                     NO. 01NI6248511
                  Qualified in Kings County
           My Commission Expires 9/19/2015

19

20

21

22

23

24

25

1

2                   C E R T I F I C A T E

3

4    STATE OF NEW YORK )

5    COUNTY OF QUEENS  )

6

7          I, JOSEPH ADLER, a stenotype reporter and

8    Notary Public within and for the State of New York,

9    do hereby certify that:

10

11                  SERGEANT FREDY CRUZ

12

13          The witness whose Examination Before Trial

14   is hereinbefore set forth, was first duly sworn by

15   me, and that such Examination Before Trial is a true

16   and accurate record of the testimony given by said

17   witness; and I further certify that I am not related

18   to any of the parties of this action by blood or

19   marriage and that I am in no way interested in the

20   outcome of this matter.

21          IN WITNESS WHEREOF, I have hereunto set my

22   hand this 19th day of September, 2014.

23

24                   _____

                          JOSEPH ADLER

25

Errata Sheet                                                201
                          Name of Witness Fredy Cruz

| Page | Line No. | From | To |
|------|----------|------|-----|
| 8 | 23 | ` ͳ ͳ ͳ ` | WAS . |
| 8 | 29 | ` ι --- ` | SELF |
| 31 | 4 | OMIT oι BACK AT THE PRECINCT |  |
| 48 | 13 | SUPEK | SUPEKULIION - |
| 68 | 24-25 | OMIT `I` You KNOW IT'S PRETTY MUCH |  |
| 131 | 14 | to LET THEM KNOW, You KNOW ` |  |
| 135 | 14 | OMIT `I` THAT `I` |  |

St - CRUZ. FRERY.

Luc/Nue

LUIS A NIEVES
Notary Public - State of New York
NO. 01NI6248511
Qualified in Kings County
My Commission Expires 9/14/205