G7CSALIC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

EDMIN ALICEA,

          Plaintiff,

       v.                         13 Civ. 7073 (JGK)

THE CITY OF NEW YORK, et al.,,

          Defendants.

------------------------------x

                              New York, N.Y.
                              July 12, 2016
                              5:41 p.m.

Before:

                  HON. JOHN G. KOELTL,

                              District Judge

                   APPEARANCES

REIBMAN & WEINER
     Attorneys for Plaintiff
BY:  JAMES SANBORN
     MARC REIBMAN

NEW YORK CITY LAW DEPARTMENT
     Attorneys for Defendants
BY:  ELISSA P. FUDIM

G7CSALIC

1          (Case called)

2          MR. SANBORN:  James Sanborn and Marc Reibman for the

3    plaintiff.

4          MS. FUDIM:  Elissa Fudim for the Office of Corporation

5    Counsel for the defendant.  Good afternoon.

6          THE COURT:  Good afternoon.  This is the final

7    pretrial conference.

8          Let me begin with the motions in limine.  First, the

9    plaintiff's motions in limine.  First, the plaintiff moves to

10   preclude the defendants from cross examining him on the fact

11   that he was convicted of armed robbery in 1999 and was released

12   from custody in August 2007.  Pursuant to Federal Rule of

13   Evidence 609(a)(1), evidence of such a felony conviction must

14   be admitted in a civil case such as this, subject to Rule 403.

15   The relevant considerations under Rule 403 do not argue for

16   exclusion, but rather favor admission because the probative

17   value of the evidence is not substantially outweighed by the

18   danger of unfair prejudice.

19         The impeachment value of the prior conviction is high

20   because the serious nature of the felony detracts from the

21   plaintiff's credibility, and the plaintiff concedes that this

22   factor weighs in favor of admission.  The remoteness of the

23   conviction is somewhat neutral because the actual offense was

24   committed more than ten years ago, but the plaintiff was

25   released well within the ten-year provision provided by

G7CSALIC

1    Rule 609(b), which reverses the rule of admissibility found in

2    Rule 609(a).  The prior conviction is not similar to the crime

3    for which the plaintiff was arrested in this case and this

4    factor, as the plaintiff concedes, weighs in favor of

5    admissibility.  The jury is unlikely to infer that simply

6    because the plaintiff committed an armed robbery in 1999, he is

7    likely to have committed a drug offense for which he was

8    arrested in this case.

9            Finally, the plaintiff argues that the plaintiff's

10   credibility will not be at issue in this case because Lindsay

11   Daniels will be testifying about the plaintiff's injuries.  But

12   only the plaintiff can offer evidence with respect to his

13   allegations concerning his encounter with the defendants,

14   whether he swallowed marijuana and whether the plaintiff was

15   subjected to excessive force.  The fourth factor favors

16   admission of the conviction because the plaintiff's credibility

17   will be important during the trial.

18           Therefore, the probative value of the prior conviction

19   is not substantially outweighed by the danger of unfair

20   prejudice, confusion or the other 403 factors.  See United

21   States v. White, No. 08-CR-0862, 2009 WL 4730234, at *3-*4,

22   (E.D.N.Y. December 4, 2009).

23           The plaintiff asks that if the prior conviction is

24   used, it be limited to the name, date, and disposition of the

25   prior conviction.  That is a reasonable request.  The details

G7CSALIC

1    of the prior conviction are unnecessary for its impeachment

2    purpose.  See United States v. Brown, 606 F. Supp. 2d 317–18

3    (E.D.N.Y. 2009); see also United States v. Estrada, 430 F.3d

4    606, 616 (2d Cir. 2005).

5         Second, the plaintiff seeks to preclude the defendants

6    from introducing his rap sheet or numerous prior instances of

7    arrests for marijuana offenses.  The defendants respond that

8    this information would be relevant if the plaintiff pursues a

9    claim of mental and emotional distress.  The defendants are

10   correct that if the defendant attempts to seek damages based on

11   testimony that he was emotionally traumatized by his arrest,

12   then the defendants should be permitted to introduce evidence

13   that this was not an unusual or traumatizing event for the

14   plaintiff.  On the other hand, if the plaintiff limits his

15   testimony to the physical pain that he allegedly suffered from

16   the excessive force, then the prior arrests should not be

17   relevant.  There is nothing about the prior arrest that would

18   lessen the pain of excessive force.  See Banushi v. Palmer,

19   08-CV-2937, 2011 WL 13894, at *3 (E.D.N.Y. January 4, 2011),

20   aff'd 500 F. App'x 84 (2d Cir. 2012); see also Jackson v. City

21   of White Plains, 05-CV-0491, 2016 WL 234855, at *4 (S.D.N.Y.

22   January 19, 2016).

23        The court notes that the third amended complaint that

24   the plaintiff filed eliminates a claim for mental and emotional

25   distress.  Therefore, the defendants are precluded from

G7CSALIC

```
1    introducing the plaintiff's rap sheet or examining the

2    plaintiff on any convictions or arrests other than the 1999

3    armed robbery conviction, unless the plaintiff opens the door

4    to such additional arrests by testifying about the unusual or

5    traumatizing effect of the circumstances of the arrest or

6    alleged malicious prosecution in this case.

7           Before attempting to introduce the prior arrests or

8    the rap sheet, the defendants should, of course, raise the

9    issue with the court outside the presence of the jury.

10          We then have the fact that there was a third amended

11   complaint that was filed, a new motion in limine by the

12   plaintiff to preclude the defendant from attempting to impeach

13   the plaintiff with the statements from the second amended

14   complaint as to the names of the police officers who subjected

15   the plaintiff to excessive force.

16          Now, I have a couple of questions.  The motion in

17   limine said that the plaintiff was filing the third amended

18   complaint with the consent of the defendants, is that correct?

19          MR. SANBORN:  Yes, except for when I initially filed,

20   I did not include as an exhibit the written consent e-mail.  I

21   refiled that before this hearing with the exhibit.

22          THE COURT:  The defendants have seen the third amended

23   complaint and consent to the filing of the third amended

24   complaint?

25          MS. FUDIM:  We consent to the filing of the third
```

G7CSALIC

```
1    amended complaint, yes.  But I don't want that to in any way
2    imply that we in any way consent to the relief being sought in
3    the motion.
4              THE COURT:  No.  Sure, I understand that.
5              MS. FUDIM:  There are distinct issues.
6              THE COURT:  It's a different issue.
7              So the plaintiff has filed a third amended complaint
8    and the defendant should answer the third amended complaint by
9    this Friday, right?
10             MS. FUDIM:  OK.
11             THE COURT:  I assume the answer is going to be very
12   similar to the answer to the second amended complaint, right?
13             MS. FUDIM:  That's my understanding, yes.  To be
14   totally candid, I did not review his third amended complaint.
15   He represented in an e-mail to me the changes.  I take him at
16   his word that those are, in fact, the changes he put in there
17   and gave my consent.  Assuming those are what he represented to
18   me, it shouldn't take long.
19             THE COURT:  I think there is another change in there,
20   actually.  My understanding of the testimony so far had been
21   that there was the alleged excessive force used on the occasion
22   of the arrest which is now alleged by Officer Arico, right,
23   with the other two officers standing by, right?
24             MR. SANBORN:  Yes.
25             THE COURT:  The other alleged use of excessive force
```

G7CSALIC

1    was excessive force in the parking lot outside the precinct,

2    yes?

3            MR. SANBORN:  Correct.  That was the plaintiff's

4    testimony, yes.

5            THE COURT:  Right.  The third amended complaint

6    alleges a rough ride without a seatbelt, which at least to me

7    was news.

8            MR. SANBORN:  I can address that, your Honor.  The

9    rough ride allegation is in the second amended complaint.

10   That's not a new allegation.

11           THE COURT:  OK, fine.  The allegation about what

12   happened outside the precinct is not there in the third amended

13   complaint.

14           MR. SANBORN:  It is in the third amended complaint.

15   What I did, your Honor, was I filed the second amended

16   complaint, which has multiple instances of the pulling of the

17   handcuffs behind the back.  The second amended complaint did

18   not break down the sequence of, once on the sidewalk, once on

19   the way to the precinct, so I just kept it the same to try not

20   to make too many changes to the pleading.

21           THE COURT:  OK, fine.  Thank you.

22           MR. SANBORN:  Thank you.

23           THE COURT:  They'll be an answer by Friday to the

24   third amended complaint.

25           Now, we come up to the plaintiff's new motion in

G7CSALIC

limine, which is to prevent the plaintiff from being impeached

with the statements from the second amended complaint on the

grounds that they are -- the probative value outweighed by the

danger of confusion.

            The defendant opposes that motion?

            MS. FUDIM:  Yes, your Honor.

            As an initial matter, I mean, I can certainly speak

off the cuff as to the basis for why I would oppose that.  In

terms of actually doing legal research and having cases, I

haven't had that opportunity yet.  This was filed yesterday

when I was in -- I had depositions yesterday and today I was in

court on other matters.  I have not had the opportunity to

really sit down and parse it out.

            My gut reaction to that is allegations made in the

complaint are judicial admissions.  I am not sure you can just

withdraw judicial admissions.  I mean, the entire length of

discovery or a large portion of the length of discovery,

defendants were operating under the notion that the person who

committed these acts was Officer Rivas, as noted in the

complaint.

            The fact that the plaintiff is now changing his story

and saying, well, no, it is Mr. Arico, does ring untrue to us.

We know they're saying he always described the perpetrator of

the conduct as a stocky man with spikey hair.  As the court

will see when these individuals come into court, Mr. Rivas is

G7CSALIC

probably five five, five six, Hispanic male.  Mr. Arico is

probably six one, six two, white male.

So, the notion that these two individuals are somehow

interchangeable, I think there is a credibility issue that all

of a sudden, after the depositions take place, after, at a

minimum, plaintiff's counsel is able to see that there is a

large height disparity between these gentlemen, all of a sudden

the allegation as to who did what changes.  And I think that

that is something that, not withstanding the amendment, that

defendants should be entitled to cross-examine the plaintiff

about.

Now, if he has an explanation as to, you know, I

always testified one thing and whatever the explanation is, I

mean, I think that that really goes to weight and not

admissibility.  The plaintiff filed a lawsuit, they filed

two -- there was actually a complaint and an amended complaint

and a second amended complaint where we got to the third

amended complaint.  Now, on the eve of trial, they want to

withdraw these prior allegations.

My gut reaction is that you can't just withdraw a

judicial admission like that.  As I said, I would appreciate

time to do some more research into this.  As I said, I didn't

have that opportunity.

THE COURT:  It is not necessary.  I am prepared to

rule.  I have read the motion and there really isn't a lot in

G7CSALIC

1   dispute.   I am prepared to rule.

2          The plaintiff concedes correctly that the second

3   amended complaint is a prior statement by the plaintiff or a

4   representative of the plaintiff and is, therefore, admissible

5   under Federal Rule of Evidence 801 as non-hearsay.   <u>See e.g.</u>

6   <u>Dweck v. Pacificorp Capital, Inc</u>., No. 91-CV-2095, 1998 WL

7   88742, at *7 (S.D.N.Y. March 2, 1998)("It is well-established

8   in the Second Circuit that superseded pleadings, while not

9   judicial admissions, per se, may be introduced as evidence and

10  considered an admission."); <u>see also Rosenberg v. Curry</u>

11  <u>Chevrolet Sales & Service, Inc</u>., 152 F.3d 920 (2d Cir. 1998)

12  (summary order).

13         The statements are plainly relevant to the allegations

14  in the case.   The plaintiff argues, however, that the

15  statements should be excluded under Federal Rule of Evidence

16  403 because they are unfairly confusing given their innocent

17  explanation.

18         However, everything that the plaintiff says in

19  explanation can be explained to the jury.   At the very least,

20  the statements in the second amended complaint can be used to

21  argue that the plaintiff was careless with the truth or the

22  facts and was prepared to level what turned out to be untrue

23  allegations against at least one individual police officer.

24  The plaintiff sued a police officer with charges of excessive

25  force when the plaintiff concedes that those allegations

G7CSALIC

against the police officer were untrue.  The plaintiff could

have sued the officer as a John Doe defendant with a physical

description, but chose not to do so.  The plaintiff can make

his explanations to the jury as to why he was mistaken in his

earlier charge, but that does not mean that the defendant

should be precluded from using the allegations to attempt to

impeach the plaintiff's credibility.  The defendants can use

the allegations from the plaintiff's earlier complaint to

attempt to impeach the plaintiff, and the plaintiff can use the

explanations that the defense counsel proffers now to explain

why the conceivably incorrect statements were made in the

earlier complaint.  The probative value of the false

allegations is not substantially outweighed by the danger of

unfair prejudice or confusion.

          The motion in limine is denied.

          That takes us to the defendant's motions in limine.

          1.  The defendants move to preclude the plaintiff's

attorneys from referring to the defense attorneys as "City

attorneys."  The plaintiff's attorneys disclaim any desire to

refer to defense counsel as City attorneys and the motion is

therefore moot.  The court notes that it will be necessary in

the voir dire to explain that the defendants are represented by

Zachary W. Carter, the Corporation Counsel of the City of New

York, and by Elissa P. Fudim and Barry Myrvold from that

office.

G7CSALIC

1          2.   The defendants seek to preclude any evidence of

2     indemnification for the individual defendants.  The plaintiff

3     agrees and the motion is therefore moot.

4          3.   The defendants seek to preclude the plaintiffs

5     from suggesting a specific dollar amount of damages to the

6     jury.  While the decision whether to allow reference to a

7     dollar amount is left to the sound discretion of the district

8     court, district courts are encouraged not to allow such

9     references and the court agrees that precluding the reference

10    to a dollar amount is, in fact, the better approach; see

11    Consorti v. Armstrong World Industries, Inc., 72 F.3d 1003,

12    1016 (2d Cir. 1995) (encouraging trial judges to prohibit

13    counsel from suggesting specific monetary awards for pain and

14    suffering), vacated on other grounds, 518 U.S. 1031 (1996);

15    Phillips v. City of New York, 871 F.Supp.2d 200, 208 (E.D.N.Y.

16    2012).  Accordingly, the defendants' motion is granted.

17         4.   The defendants argue that the plaintiff should not

18    be permitted to examine the individual defendants on their

19    prior disciplinary history because that history is not

20    admissible under Federal Rule of Evidence 404(b).  The

21    plaintiff responds that he is not attempting to introduce the

22    specific instances of misconduct under Federal Rule of Evidence

23    404(b) and therefore the motion is misguided.  Rather, the

24    plaintiff alleges that specific instances of misconduct can be

25    used for impeachment under Federal Rule of Evidence 608(b) so

long as they are probative of untruthfulness.  The plaintiff
has not detailed the specific instances, but offers to do so at
trial before cross examination.  It is plain that some
instances in a disciplinary record may be probative of
untruthfulness, such as prior instances of lying.  However, the
usefulness of Rule 608(b) is somewhat limited because the rule
allows examination into the prior instances, but does not allow
extrinsic evidence to prove those instances.  See United
States v. Nelson, 365 F.Supp.2d 381, 386 (S.D.N.Y. 2005); Jack
B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence
Section 608.22[1] (2d ed. 1997).  Moreover, although the
misconduct may be admissible, disciplinary findings would not
be allowed because they would violate the rule against
extrinsic evidence and would involve the hearsay conclusions of
a third party.  See 2003 Advisory Committee Note to Rule 608;
Redd v. New York State Division of Parole, 923 F.Supp.2d 393,
405 (E.D.N.Y. 2013); United States v. Nelson, 365 F.Supp.2d at
389, n.3.  Eng v. Scully, 146 F.R.D. 74, 78 (S.D.N.Y. 1993).
Further guidance on this issue must await the plaintiff's
proffer at trial.  Obviously what I mean by that is that the
plaintiff has suggested that, before examining the defendants
with respect to specific instances of prior misconduct, the
plaintiff would raise it with the court and assure that the
prior instances go to the witness's truthfulness and doesn't
violate any of the other restrictions under the use of such.

G7CSALIC

1           5.   The defendants seek to preclude any reference to

2      the Patrol Guide because the Patrol Guide does not establish

3      the requirements of what is required by the Constitution and

4      thus would be unnecessarily confusing.   However, the court sees

5      no reason to deviate from what the court said in the Williams

6      case.   See Williams v. City of New York, 11-CV-5202, Dkt. No.

7      47 at 44-45 (S.D.N.Y. July 3, 2012).

8           The Patrol Guide can be used to impeach the

9      credibility of the individual defendants.   If the defendants

10     fail to act in the way that the Patrol Guide instructs and the

11     way the defendants were presumably trained to act, then those

12     facts could be taken into account by the jury in assessing the

13     defendants' testimony about what they did.   The court could

14     give an appropriate limiting instruction to prevent any

15     confusion.   In particular, the court could make it clear that

16     the Patrol Guide does not set out the standards for conduct

17     required by the Constitution.   The court welcomes an

18     appropriate limiting instruction from the parties.

19          6.   The defendants seek to remove the names of the

20     individual defendants who are no longer defendants from the

21     caption.   The plaintiffs do not object to removing those

22     defendants namely Baboolal, Cruz, and McGrath, and those

23     defendants will therefore be removed.

24          With respect to the City, the defendants argue that

25     the City would automatically be liable under respondeat

G7CSALIC

superior if Officer Rivas is found liable for the state tort of

malicious prosecution.  The plaintiff responds that there still

would have be to be a finding that Officer Rivas was acting in

furtherance of his duties as an employee and that the city was

exercising some control over his activities.  It is plain that

if the City stipulates that if a verdict is returned against

Officer Rivas for the state tort of malicious prosecution,

judgment can be entered against the City for that amount, then

there would no longer a reason for the City to be named as a

defendant and could be removed from the caption and the verdict

sheet.  See Blake v. City of New York, No. 05-CV-95913, 2007

U.S. District Lexis 95913, at *5-*6 (S.D.N.Y. July 13, 2007).

Short of such a stipulation, however, the City needs to remain

as a defendant with an appropriate instruction to the jury as

to how the City can be liable under respondeat superior.

          The court certainly invites the parties to discuss

whether they wish to enter into an appropriate stipulation.

The City, I believe, has entered such stipulations in at least

one other case.  Whether the City chooses to do that in this

case is something for the parties to discuss.

          MS. FUDIM:  The City is prepared, your Honor, to make

such a stipulation.

          THE COURT:  Plaintiff, the City would stipulate that

if Officer Rivas is found liable for the state tort of

malicious prosecution, judgment can be entered against the City

G7CSALIC

1    for the damages found against Officer Rivas for the tort of

2    malicious prosecution.  That would mean that the City could be

3    liable for that amount of money, even if for some reason there

4    was qualified immunity for Officer Rivas, right?

5              Hold on.

6              MS. FUDIM:  I understand.  I am thinking about what

7    you said.

8              You're saying that if there were qualified immunity

9    for Officer Rivas on the state law malicious prosecution claim,

10   that the City would still be liable under respondeat superior?

11             THE COURT:  Respondeat superior, because qualified

12   immunity is an individual defense for the officer, it is not a

13   defense for the City, right?

14             MS. FUDIM:  I haven't looked at that issue.  I am not

15   prepared to say something one way or the other right or wrong.

16             THE COURT:  So you have to answer those questions

17   before the City is simply taken out of the case, right?

18             MS. FUDIM:  Well, I understand that when I discussed

19   this matter prior to coming to court today --

20             THE COURT:  I'm sorry.  Have you discussed it with the

21   plaintiff before today?

22             MS. FUDIM:  No, I'm sorry, we discussed it internally

23   at the City.

24             My understanding from conversations that I had with

25   others at the City was that we are prepared to make that

G7CSALIC

1    stipulation, but it was sort of an offhanded comment made to me

2    and I did not participate in a conversation where we discussed

3    qualified immunity in particular.  But I was instructed that I

4    could represent in court today that we stipulate to that.

5              THE COURT:  What's the plaintiff's view?

6              MR. SANBORN:  The plaintiff's view, your Honor, is

7    that if there is an appropriate agreement by the City, that the

8    City will be liable, if Officer Rivas is found to have

9    subjected plaintiffs malicious prosecution under state law open

10   and shut, that the City is liable, then of course we would

11   stipulate to that.

12             THE COURT:  I suggest that you at least consider the

13   issue of qualified immunity.  I mean, how could there be

14   qualified immunity for malicious prosecution if the jury found

15   that there was malicious prosecution.  It requires a state of

16   mind.  The law has clearly established what questions would be

17   left open to answer for a finding of qualified immunity, right?

18             MS. FUDIM:  I think that is right.  I think that is

19   precisely.  It is not an issue that I ever really thought

20   about.  It is not an issue that often comes up for precisely

21   the reason that you just said.

22             THE COURT:  Similarly, look, is the City intending

23   that there was a qualified immunity defense to the claim of

24   excessive force?

25             MS. FUDIM:  I think that the City's claim, your Honor,

G7CSALIC

1    is that there was no excessive force.

2            THE COURT:  Right, I understand that.  And whether

3    there is qualified immunity is a legal question for the court.

4    If there are any disputed issues of fact, the jury has to

5    answer them in terms of special interrogatories, if you will.

6            The City should plainly think about whether there is

7    really any viable defense of qualified immunity on either

8    excessive force or malicious prosecution, and if there was,

9    whether there are any questions of fact for the jury to answer

10   in terms of interrogatories if they found there was excessive

11   force or malicious prosecution.

12           Do you follow what I said?

13           MS. FUDIM:  Yes.

14           THE COURT:  It sounds like there's, pretty much,

15   agreement that the parties will be entering into a stipulation

16   subject to some further questions by the defendant that will

17   take the City out of the case and make it clear that if the

18   jury finds malicious prosecution and against Officer Rivas,

19   that the City is liable for whatever damages the jury finds

20   against Officer Rivas.

21           You all should talk about the stipulation and give me

22   the stipulation by July 19 so that I can make sure that I

23   remove the City from the caption and from my initial

24   instructions to the jury and voir dire.

25           The City will have an answer to the third amended

G7CSALIC

complaints by July 15, and the parties will submit an

appropriate stipulation with respect to the City's liability on

the malicious prosecution count by July 19.

          Trial will begin on Monday, August 8, at nine a.m.

Each side will have six hours for the examination of witnesses.

You should get my trial rules, to the extent you haven't gotten

them already.

          Do you both have my trial rules?

          MR. SANBORN:  We do.  I believe it was e-mailed to us.

          THE COURT:  Great.  Thank you.

          Generally, we will sit from 9:30 to 12:45 and from

2:00 until 5:00.  I discourage side bars.  I am perfectly happy

to come in early in the morning to talk to you at lunch, talk

to you at the end of the day, to avoid using up the jury's

time.  I take faxes.  If you know that there is going to be an

evidentiary issue coming up, send me a fax or raise it with me

before the jury comes in or at lunch or after the jury leaves.

          In going over the joint pretrial order, I saw that

there were a lot of exhibits that either had no star or had

only a single asterisk.  I urge you to talk to each other about

those.  There seem to me to be some obvious exhibits that you

all ought to be able to double star.

          I mean, the plaintiff's medical records, you surely

don't need someone from the hospital to come in, do you?

          MS. FUDIM:  Well, at the time that we did the JPTO,

G7CSALIC

```
1    your Honor, the plaintiff said he was going to be providing us

2    with certified copies, because the copies that had previously

3    been provided, none of them were certified copies, which is why

4    we left it as it was when we filed the JPTO.

5         In the interim, counsel's provided certifications.  I

6    don't know if it was for all, but for several of them.  So the

7    ones that there are certifications on, there is not going to be

8    an issue on.

9         I understand from plaintiff's counsel that they are

10   going to be obtaining certifications on the other ones.  I

11   think that the issue will be moot, but at the time that we did

12   that, there had never been any type of certification, which is

13   why it was indicated as such.

14        THE COURT:  I am glad to hear that you're working it

15   out.

16        There is also the plaintiff wanted to admit the memo

17   books relating to the date of the incident from several

18   officers, and those are marked with a single asterisk.  Why

19   would the defendant be resisting the memo books?  I assume that

20   the officers would testify, if called, that they were business

21   records.

22        It is particularly odd because the defendants want to

23   introduce Officer Regan's memo book and the plaintiff agrees to

24   admit it, and yet the defendant doesn't want to admit the memo

25   books from the other officers.  Is there some reason why the
```

G7CSALIC

```
1    other officers have particularly unreliable memo books and

2    Officer Regan's memo book is particularly good?

3            MS. FUDIM:  No.  I think, your Honor, that the basis

4    for starring it was that the plaintiff has a date that is wrong

5    in the description.  He listed them as March 17, 2012, which is

6    not the date of the incident.  I believe that had to do with

7    it.  This portion of the JPTO and the starring is not something

8    that I personally did.  One of my colleagues did it, so I am

9    trying to think back to what we had conversations about.

10           I think that that was part of it.  I really can't

11   speak to that because I didn't do this section of the JPTO.

12           THE COURT:  I suggest you have a conversation with the

13   plaintiff's counsel and try to work out the issues with respect

14   to the exhibits, because there doesn't seem like there is a

15   basis to waste the jury's time with disputes over some of these

16   exhibits.

17           You all should get my jury rules.  Did Mr. Fletcher

18   e-mail those to you, too?

19           As you see, I use the struck panel.  I intend to seat

20   eight jurors for this case.  Each side gets three peremptories,

21   so you'll have 14 jurors for purposes of the voir dire, all

22   seated in the box, seven and seven.

23           I'll be asking the jurors questions.  If any of those

24   questions deserve followup, I'll do the followup usually at the

25   sidebar.  You are all obviously welcome to come up to the
```

G7CSALIC

     1   sidebar and listen to the examination.  I usually ask the juror

     2   to step back, and if either of you have any additional

     3   questions, then I'll ask the additional questions.

     4           If, in the course of examining the juror, it appears

     5   that there is a challenge for cause, the juror will be excused.

     6   Another juror's name from the back will substitute for that

     7   juror.  I'll ask if the juror has been listening to all the

     8   questions and is there any information to be brought to my

     9   attention.  If not, we will just then continue.

    10           If, in the course of the examination, either of you

    11   thinks that there is a challenge for cause, please bring it to

    12   my attention.  If both of you agree on a challenge for cause, I

    13   will probably agree also, and it will expedite the process.

    14   The juror will simply be excused, another juror will be seated.

    15           After the general questions to all of the jurors in

    16   the box, they'll answer individual questions which will be

    17   written out on questionnaires, and after all of the 14 jurors

    18   have answered the individual questions, we will then take a

    19   break and you all will have the opportunity, first of all, to

    20   tell me whether there are any other questions for the jurors

    21   and whether there are any challenges for cause.  There really

    22   shouldn't be any challenges for cause at that point because you

    23   have been bringing them to my attention as we go along.  If

    24   there are, you bring them to my attention, and I'll rule.

    25           You then exercise your peremptories, three rounds.

G7CSALIC

Each side exercises one peremptory in each round.  Plaintiff
defendant, plaintiff defendant, plaintiff defendant.  You can
exercise your peremptory challenges in any order that you like
against any one of the 14 jurors.  You don't have to exercise
them numerically.  You exercise against any of the 14.

The lowest number eight jurors will be your jury.  So
if either parties waives in any individual round, it would be
the equivalent of excusing juror No. 14.  If juror No. 14 is
off and someone waives, it is the equivalent of excusing juror
No. 13, because it will be the lowest eight numbered jurors who
are your jury.  If both sides, plaintiff and defendant, waive
in any round, jury selection is over, and the lowest numbered
eight will be your jury.

That's the way in which it will go.  Any questions
about jury selection?

MR. SANBORN:  None from the plaintiff.

MS. FUDIM:  No, your Honor.

THE COURT:  Let me read you my description of the case
for the jury to see if you all agree.

As I explained, this is a civil case.  The case is a
relatively short case.  It is expected to last about one week.
The plaintiff in this case, that is the party who brought the
case, is Edmin Alicea.  The defendants are the City of New
York, Police Officer Alejandro Rivas, Police Officer Paul
Arico, and Police Officer Brendan Regan.

G7CSALIC

1          The plaintiff, Mr. Alicea, alleges three causes of

2     action arising out of his arrest and prosecution in 2012.  He

3     alleges that, in the course of arresting him, Police Officer

4     Arico choked him, hit him, and restrained him with excessive,

5     tight handcuffs, while Officers Rivas and Regan stood by.  He

6     also alleges that he was transported to the precinct in a

7     manner designed to cause him pain and injuries.  He also

8     alleges that Officer Rivas made false statements in a criminal

9     complaint that led to his prosecution.

10         Mr. Alicea has brought three claims.  He has sued

11    Officers Arico, Rivas, and Regan, for allegedly using excessive

12    force against him in violation of 42 U.S.C. Section 1983, a

13    federal civil rights statute.  He has also sued Officer Rivas

14    for malicious prosecution in violation of Section 1983.

15    Finally, he has sued Officer Rivas and the City of New York for

16    malicious prosecution in violation of New York State law.

17         The defendants have denied all of the plaintiff's

18    claims and assert that they did nothing improper in connection

19    with the plaintiff's arrest and prosecution.

20         This is only a summary of the parties' contentions.

21    Under the law, the facts are for the jury to determine and the

22    law is for the court.

23         Is that an acceptable description of the claims?

24         MR. SANBORN:  Your Honor, on the specific description

25    of the use of force by Defendant Arico, one plaintiff is not

G7CSALIC

alleging he was hit by Arico, he is alleging he was choked,

handcuffs were placed on him in an excessively tight manner,

and then the --

THE COURT:  I said he alleges Police Officer Arico

choked him, hit him, and restrained him with excessively tight

handcuffs.  You want me to drop hitting?

MR. SANBORN:  Hit him, and after the restraining with

the excessively tight handcuffs, and the real linchpin, your

Honor, of the fourth claim is the pulling of the handcuffs up

to such a degree, what we would say to such a degree that

caused him injury.  I'm sure we don't want to be too

argumentative here.  That last action, which is really the

linchpin of the force claim, needs to be in that summary.

THE COURT:  He choked him, restrained him with

excessively tight handcuffs, and yanked the handcuffs up

causing -- yanked him up by the handcuffs, injuring him, right?

MR. SANBORN:  Yes.

THE COURT:  He alleges that Officers Rivas and Regan

stood by watching and failed to intervene, right?

MR. SANBORN:  Yes.

THE COURT:  He also alleges that he was transported to

the precinct in a manner designed to cause him pain and

injuries, right?

MR. SANBORN:  Correct, your Honor.

THE COURT:  Anything else?

G7CSALIC

1          MR. SANBORN:  I apologize, your Honor.  Did the

2      description of the yanking, was it specific to only the scene

3      of the arrest?  As we discussed earlier, we do allege that it

4      occurred a second time on the way inside the precinct.  I

5      wasn't sure if we encapsulated that in the summary.  It is

6      still, possibly the summary can use a multiple of the verb, the

7      plural of the verb.  I apologize.

8          THE COURT:  No.  It's all right.

9          Does he allege that it was yanked up twice?

10         MR. SANBORN:  He alleges multiple times.  I believe

11     his deposition testimony is that the actual instance of the

12     yanking occurred twice before he was placed in the car, and

13     then Defendant Arico performed a similar action on the way

14     inside the precinct.

15         THE COURT:  So he alleges that Officer Arico yanked

16     him up by the handcuffs, yanked him up by the handcuffs several

17     times, thereby injuring him.  He alleges that Officer Rivas and

18     Regan stood by watching and failed to intervene on at least one

19     occasion.

20         MR. SANBORN:  Our allegation is that Rivas and Regan

21     were present for both instances.

22         THE COURT:  I just have to say he also alleges that

23     Officers Rivas and Regan stood by watching and failed to

24     intervene?

25         MR. SANBORN:  Yes, your Honor.

G7CSALIC

1    THE COURT:  He also alleges he was transported to the

2    precinct in a manner designed to cause him pain and injuries.

3    MR. SANBORN:  Nothing else for the plaintiff, your

4    Honor.

5    THE COURT:  Defendant?

6    MS. FUDIM:  Just the reference, your Honor, to the

7    City at the beginning of the portion you read.

8    THE COURT:  Yes, but I can't do anything until you

9    give me a stip, but I'll put it in brackets just to remind me.

10   He has sued Officer Rivas for malicious prosecution and

11   violation of New York state Law.  And, yes, I'll take out the

12   other reference to the City as a defendant, if they're out.

13   I'll put it in brackets now.

14   MS. FUDIM:  OK.

15   THE COURT:  The introduction to the parties, the

16   plaintiff, Edwin Alicea, is represented by Mark Reibman.

17   MR. REIBMAN:  Your Honor, yes.  It would be Reibman.

18   THE COURT:  Mark Reibman and James Sanborn of Reibman

19   & Weiner.  Please stand.

20   MR. REIBMAN:  He might not be present, but I think

21   Weiner would be present.

22   THE COURT:  I'm sorry?

23   MR. REIBMAN:  He might not be here, but I think Weiner

24   would be preferable than Weiner, if possible.

25   THE COURT:  Oh, sure.  You tell me on the day of trial

G7CSALIC

```
 1    if you have anyone else sitting at counsel table you want me to
 2    introduce.
 3            MR. REIBMAN:  I understand.
 4            THE COURT:  The defendants are the City of New York,
 5    if they're still here, Police Officer Rivas, Police Officer
 6    Paul Arico, and Police Officer Brendan -- is it Regan?
 7            MS. FUDIM:  Regan.
 8            THE COURT:  Regan, not Reagan.
 9            MS. FUDIM:  Regan.
10            THE COURT:  -- are represented by Zachary W. Carter,
11    the Corporation Counsel of the City of New York, and Elissa P.
12    Fudim and Barry Myrvold from the corporation counsel's office.
13            MS. FUDIM:  Nobody would like to know more than me who
14    my trial partner is going to be on this case, Judge.
15            THE COURT:  I'm sorry?
16            MS. FUDIM:  Nobody would like to know more than me who
17    my trial partner is going to be on this case.  As many times as
18    I have asked, I am told I have to wait.  It might be
19    Mr. Myrvold, it might be someone else.
20            THE COURT:  That's fine.  But is that OK?
21            MS. FUDIM:  Yes.
22            THE COURT:  Elissa P. Fudim and whoever it is from the
23    corporation counsel's office.
24            You don't want me to say assistant corporation counsel
25    or senior corporation counsel?
```

G7CSALIC

1          MS. FUDIM:  Not necessary, no.  It is Fudim, though,

2     your Honor.

3          THE COURT:  I'm sorry.

4          MS. FUDIM:  It is pronounced Fudim.

5          THE COURT:  Come again?

6          MS. FUDIM:  Fudim, like you're feuding with somebody.

7          THE COURT:  Oh, Fudim.

8          MS. FUDIM:  I think you said Fudim.  It is Fudim.

9          THE COURT:  Fu like fuel.  I'll try to remember that.

10          MS. FUDIM:  It is OK if you don't.  I am just telling

11     you.

12          THE COURT:  It's all right.  Tell me at break if I am

13     doing it wrong.  I have enough experience with having your name

14     mispronounced that I would like to pronounce names correctly.

15          Witnesses or parties whose names you may hear, do any

16     of you know or have you had any dealings, personal business,

17     with any of these people:  Edwin Alicea, Lindsay Daniels, Zwi

18     Wasserstein, Darren Jay Friedman, Richard Baboolal, Alejandro

19     Rivas, Paul Arico, Brendan Regan, Terrence McGrath, Dr. Ramesh

20     Gidumal.

21          Any other names they may hear?

22          MS. FUDIM:  No, your Honor.

23          MR. SANBORN:  No, your Honor.

24          THE COURT:  Places.  There may be testimony about

25     events that occurred at what places would you like me to

G7CSALIC

1   mention?

2                Plaintiff was arrested where?

3           MR. SANBORN:  He was arrested outside 172nd and

4   Broadway, so outside the building on that street.

5           THE COURT:  Is there an address?

6           MR. SANBORN:  Yes.  Sorry, your Honor, there is.  I do

7   not have it in front of me, however.

8           THE COURT:  You can give me the cross streets.

9           MR. SANBORN:  The cross streets is Broadway and 172nd

10  Street.  The actual physical location was a little bit west on

11  172nd Street, so the physical address is on 172nd.

12          THE COURT:  It is enough for me to say there may be

13  testimony about events that occurred around Broadway and West

14  172nd Street, is there anything about that fact that would

15  interfere with your ability to be fair and impartial.

16          The reason for the question is, obviously, if a person

17  lives at Broadway and 172nd Street, they may have personal

18  knowledge of this case, and probably it would be a question of

19  whether they could sit as a juror.

20          Any other specific places?

21          MR. SANBORN:  On that point, your Honor, it may make

22  sense to include the surveillance zone, which is where

23  defendants claim plaintiff purchased marijuana, which is 100

24  West 172nd Street, this time between St. Nicholas and Audubon.

25          THE COURT:  West 172nd street between St. Nicholas

G7CSALIC

1    Avenue and Audubon Avenue.

2              Great.  That completes my questions.

3              Do you all have anything else to raise with me?

4              MR. SANBORN:  Nothing from the plaintiff at this time,

5    your Honor.

6              MS. FUDIM:  Just one thing, your Honor.

7              Since the time that we filed our proposed jury

8    instructions and plaintiff has now withdrawn any claim for

9    mental anguish on the malicious prosecution claims, we would

10   want something in the jury instruction regarding that.  There

11   is nothing there now because that wasn't an issue at the time.

12             THE COURT:  I'll make it clear in the description of

13   damages that the plaintiff is not claiming any damages for

14   emotional distress.

15             Anything else?

16             MS. FUDIM:  That's all I have at this time, your

17   Honor.

18             THE COURT:  At the conclusion of a final pretrial

19   conference, I usually raise with the parties the issue of

20   settlement.

21             I raised it with you last time, didn't I?

22             MR. SANBORN:  Yes, your Honor.

23             THE COURT:  The parties told me this is a case that

24   will not settle.  There is very little point in my exhortations

25   to you.  I will tell you that you should talk about the

G7CSALIC

1    possibility of settlement.  The plaintiff should make a demand.

2    Whether you settle is completely up to you.

3              I will see you at nine o'clock on August 8.  The case

4    will definitely go to trial on that date, so the time for

5    litigation strategy, if ever there was time, is now over, and

6    the case either settles or it doesn't.  You should at least

7    talk about it, because one of you will be right and one of you

8    will be wrong.  I always hate to see that.

9              The jury will tell us who was right and who was wrong,

10   and whatever the discussions are between you all, whether it be

11   the demand or the offer or the lack of offer, again, the jury

12   will tell if who was right and who was wrong.

13             The only way that neither of you will be wrong is if

14   the case actually settles, but that is up to you.  I am here to

15   try the case and I will put in the jury demand, and we will

16   have the panel up here as close to probably 9:30 as we can.  I

17   want you all here at nine so that we can talk about whether

18   there is anything else that has come up.

19             I will see you at nine o'clock on August, the 8th.

20   Thank you.

21             (Adjourned)

22

23

24

25